**W. L. BIRKHOLZ et al., Plaintiffs-Appellants,**

v.

**Elmer L. DIRKS, etc., et al., Defendants-Appellees.**

**No. 16340.**

United States Court of Appeals
Seventh Circuit.

Feb. 12, 1968.

Lee Leibik, Ruth Weyand, Chicago, Ill., for plaintiffs-appellants.

John J. Naughton, Chicago, Ill., David Leo Uelmen, Milwaukee, Wis., James P. Reedy, T. J. McDonnell, A. W. Summers, Chicago, Ill., David Previant, Gerry M. Miller, Milwaukee, Wis., for defendant-appellee; Goldberg, Previant & Uelmen, Milwaukee, Wis., of counsel.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

The Switchmen's Union of North America (SUNA) and six of its members sued, individually and as representatives of all members of SUNA who are yard service employees on the Milwaukee, St. Paul, and Pacific Railroad (Milwaukee), seeking a judgment declaring the union shop agreement between the Milwaukee and the Brotherhood of Railroad Trainmen (Trainmen) void, and seeking damages and injunctive relief. The district court after a hearing dismissed the suit and SUNA and the representative employees appeal. We reverse.

The Trainmen's Union has, since the 1926 adoption of the Railway Labor Act, served as bargaining agent for the Milwaukee's yard service employees. Both SUNA and the Trainmen are among the five national operating craft unions represented on the National Railroad Adjustment Board under Sec. 153(h) of the Railway Labor Act, 45 U.S.C. Since the Trainmen's Union has been the bargaining agent, some yard service employees have held cards in SUNA rather than in the Trainmen.

On November 14, 1966, SUNA filed a petition before the National Mediation Board for a representative election seeking certification as bargaining agent for all yard service employees of the Milwaukee. Two days later the Trainmen served notice on the Milwaukee for modification of the existing agreement, made in 1953. On February 1, 1967, the agreement was modified by adding the union shop amendment in dispute.[1]   SUNA

---

1. Section 1.

   (a) * * * all employees of the company * * * except as hereinafter provided, shall, as a condition of their continued employment * * * become members of the Brotherhood within six-ty calendar days * * * and thereafter shall maintain membership in the Brotherhood; * * *

   (b) It is agreed, as a condition of continued employment, all employees of the company shall hold or acquire mem-

then brought this suit to void the amendment on the ground that it violated Section 2 Eleventh(c) of the Railway Labor Act.[2]

The district court in dismissing SUNA's complaint decided that the Milwaukee and Trainmen could contract to require members of SUNA to join the Trainmen despite the language of 2 Eleventh(c) because SUNA did not support the bargaining agreement's grievance committee, and had no obligation to the Milwaukee employees; and because the court was persuaded by defendants' argument that 2 Eleventh(c) must be restrictively interpreted to permit the type of union shop clause in the Trainmen's contract because the only purpose of 2 Eleventh(c) was to prevent an employee who temporarily changed crafts from being required to change unions and the contract provision fulfills this purpose. The court relied upon Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 492, 77 S.Ct. 421, 1 L.Ed.2d 480 and Rohrer v. Conemaugh & Black Lick R. R. Co., 3 Cir., 359 F.2d 127.

The Trainmen and Milwaukee concede that their union shop clause violates Sec. 2 Eleventh(c) of the Railway Labor Act if that section is read literally. We agree. Par. (c) qualifies the right to enter into a union shop agreement given under Par. (a).[3] Under Par. (c) the membership requirement of the union shop clause must be satisfied as to employees "in engine, train, yard or hostling service" by membership in any union "national in scope, organized in accordance with the Act" which admits to

bership in any one of the labor organizations, national in scope, organized in accordance with the Railway Labor Act, having a labor contract with the C. M. St. P. & P. Railroad Company (lines East) covering employees of a class or craft in train or yard service; provided, however, that nothing contained in this agreement shall prevent any employees from changing membership from one organization to another labor organization, having a labor contract with the C. M. St. P. & P. Railroad Company (lines East), covering employees of a craft or class in train or yard service; provided, further, however, that the right of a yardman, who does not hold interchangeable rights, to acquire or hold membership in an organization shall be confined to the Brotherhood.

2. (c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of Section 153 of this title, defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subpara-

graph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

3. * * * any carrier * * * and a labor organization * * * shall be permitted—

(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class:
* * * * * * *

membership any employee in a craft covering any of the services designated. It is plain that under the literal language of Par. (c) any requirement of membership in the Trainmen's Union negotiated under Par. (a) would have to permit alternative membership in SUNA since SUNA admits yard service employees to membership, and is, as the district court found, "national in scope and organized in accordance with the Act."

The union shop agreement signed by the Milwaukee and the Trainmen does not permit yard service employees to maintain alternate membership in SUNA. Under the agreement all operating craft employees must belong to the Trainmen unless they belong to another union which is national in scope and has a contract with the Milwaukee and unless the particular yardman concerned has interchangeable rights, i. e., the right to be employed in another craft in addition to yard service. Thus the contract requires two conditions, in addition to the national in scope requirement of the Act, before alternate union membership is permissible. Under this agreement a yard service employee's membership in SUNA cannot serve as a substitute for membership in the Trainmen since SUNA has no contract with the Milwaukee and since most yard service employees do not have interchangeable rights.

The vital issue before us is whether Sec. 2 Eleventh(c) renders the February 1, 1967 union shop clause of defendants' agreement void. We think that the literal reading of Sec. 2 Eleventh(c) expresses the intention of Congress as demonstrated by the legislative history of the Act.

The legislative background of Sec. 2 Eleventh(c) is well known. In 1934 Congress, in an effort to combat company dominated unions which were then prevalent on railroads, outlawed the union shop. In 1951, however, railway labor organizations sought the authorization of union shop agreements. Congress was agreeable to authorizing the union shop but in hearings encountered the problem of intercraft mobility. Operating employees organized along craft lines frequently changed crafts either through temporary promotions or demotions as the railroad's needs for workers of a particular craft dictated. An employee who worked in one craft and belonged to his craft union might, for example, upon being promoted to another craft be required by a union shop agreement to belong to the union which represented the new craft to which he had been temporarily promoted. He would then be faced with the choice of either maintaining dual union membership or of quitting his old union and perhaps sacrificing interests in pensions and other benefits under his original craft membership. The problem of intercraft mobility could also affect union members who have no interchangeable rights in another craft. The union to which these members belong might lose its majority to another craft union whose members have interchangeable rights with the first craft and are transferred into that craft. The craft union whose members had interchangeable rights could then negotiate a union shop agreement requiring the employee in the first craft to quit his now minority union or maintain dual union membership.

The evil of placing upon the operating employee the choice of maintaining dual union membership or of quitting his old union was recognized by Congress at the time proposals for authorizing the union shop were being considered. Three proposals for preventing this evil and solving the problem of intercraft relationships among operating employees were considered. The first proposal was aimed at protecting employees from denial of membership in the bargaining union because of membership in another union. This would have protected, for example, a member of the firemen's union from being denied membership in the engineers' union and thereby being denied work in a unit represented by the engineers. All operating unions objected to this proposal because it would not eliminate the choice of maintaining dual union

membership or of quitting the union the employee had belonged to in the past.

The second solution was presented by the Trainmen. Under this proposal the union membership requirement authorized by Sec. 2 Eleventh(a) could be satisfied with respect to closely related crafts where the employee held employment rights in more than one, or promotional rights from one, to another, by membership in the craft union which represents the employees in any craft in which he is entitled to work. In other words, the employee member of one of the five crafts could satisfy the membership requirement only by membership in the union that is the bargaining agent for the craft in which he is working or in a union that is the bargaining agent for another craft in which he is also entitled to work.

This second proposal would have provided the identical amount of protection for minority union members as does the contract entered into by the Trainmen and the Milwaukee and as would Sec. 2 Eleventh(c) if interpreted in the manner urged by the Trainmen. The Trainmen's proposal was rejected by Congress. While it is clear that the Trainmen's proposal would adequately protect the employee who was transferred from one craft to another and did not wish to give up membership in the union which represented his original craft, the proposal would offer no protection to the operating craft employee whose union became a minority union due to an influx of transferees from another craft, nor would the proposal give recognition to the operating craft tradition of permitting membership in minority unions.

The third proposal was a prohibition against requiring membership in more than one labor organization. This would have permitted an employee represented by an operating craft union to maintain membership in a nonoperating union despite the existence of a union shop agreement.

The union shop bill as reported to the Senate contained the third proposal outlined above and because of this was op-posed by the Trainmen and three other operating brotherhoods. The Senate postponed consideration of the bill to enable the four brotherhoods to produce a compromise proposal which they could all support. The result was the present language of Sec. 2 Eleventh(c) which was approved by the four brotherhoods and which was ultimately incorporated in the Act.

In the light of this legislative history we must reject the restrictive interpretation of Sec. 2 Eleventh(c) which the Trainmen urged unsuccessfully upon the Senate Committee and now urge upon us. We hold that the union shop provision of the collective bargaining agreement before us is violative of Sec. 2 Eleventh (c) properly interpreted.

We think it would be absurd to interpret away the literal language of 2 Eleventh(c) by reading it as though it said almost exactly what was said in a proposal which was rejected at committee hearings and which places members of SUNA—organized under the Act and national in scope and covering the craft of yard services—in the dilemma of choosing between compulsory dual unionism or a compulsory change from their own craft union to the Trainmen. Each horn of this dilemma was rejected by Congress in 1950. If Congress had intended to limit the protection afforded by 2 Eleventh(c) in the manner urged by the Trainmen they would have used the explicit language which the Trainmen had suggested to them. Moreover it must be remembered that the actual language of 2 Eleventh(c) was drafted by four operating brotherhoods including the Trainmen, and had these brotherhoods agreed that it was desirable to limit the scope of 2 Eleventh(c) as the Trainmen wished, they would have adopted the explicit language previously proposed by the Trainmen.

Moreover, if the interpretation of 2 Eleventh(c) urged by the Trainmen were adopted the result would be to render the second proviso of 2 Eleventh(c) devoid of any meaning. The second proviso states that "nothing herein or in any such

agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services." The Trainmen's contract prevents craft employees from switching from the Trainmen to other operating craft unions.

We are impressed with the reasoning of Judge Herlands of the Southern District of New York in his opinion in O'Connell et al. v. Erie Lackawanna Railroad Co. et al., 268 F.Supp. 397. Judge Herlands rejected the argument of the Trainmen there that Sec. 2 Eleventh(c) should not be construed to make a union shop provision requiring members of other operating craft unions to join the Trainmen unlawful, where the men concerned did not have interchangeable rights. Judge Herlands pointed out the difficulties that would follow upon an insistence that Congress, even though it did not express it, intended the validity of a union shop agreement to depend on the interchangeable rights of each employee in the majority and minority unions involved. The result, as Judge Herlands stated, would be that each member of a minority union who is within the jurisdiction of a bargaining contract would be faced with the necessity of proving rights in another craft, and as a result federal courts might be called upon to make ad hoc adjudications in a large number of individual cases. Judge Herlands pointed out several practical problems which would be encountered in making these determinations. One reason that Sec. 2 Eleventh(c) was drafted as it was may well have been to avoid such problems.

We also consider the contemporaneous interpretation of this Section by the operating craft brotherhoods significant in determining its proper interpretation, since they themselves drafted the Section to meet their own needs. It is undisputed that for fifteen years after the passage of the Act all union shop agreements entered into by standard operating unions, including the Trainmen, contained the exact literal language of Sec. 2 Eleventh(c) and that that language was interpreted to permit alternate membership in any standard operating craft union. The Trainmen's position would suggest that the drafters of 2 Eleventh(c), including itself, did not know what the Section meant and have been misapplying it for fifteen years. This position is inherently unpersuasive especially when it is recognized that the interpretation now urged would change the law to conform to the proposal which the Trainmen unsuccessfully advocated before Congress at the time the Section was enacted.

The fifteen year practice of allowing membership in any standard operating craft union to satisfy union shop agreements also militates strongly against the Trainmen's argument that the elimination of minority representation would promote peace between unions. It is difficult to see how labor peace would be promoted by abrogating what is, in effect, an agreement between the operating brotherhoods which has guided their relations for fifteen years.

We believe that the railroad unions responsible for Sec. 2 Eleventh(c) and Congress, deliberately chose to avoid the dangers of dual unionism by the method outlined in the literal language of Sec. 2 Eleventh(c) in order to provide clear and unequivocal protection from compulsory dual union membership, and also to avoid upsetting the balance of union power between the majority union bargaining agent and substantial minority union members within the bargaining unit.

We do not find Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L. Ed.2d 480, to be inconsistent with our conclusion that membership in SUNA must satisfy any union membership requirement negotiated by the Trainmen with the Milwaukee. The holding in *Rychlik* is that Sec. 2 Eleventh(c) of the Act makes only unions already qualified as electors for the labor members of the National Railroad Adjustment Board under Sec. 3 First, available for alternate membership under a union shop agree-

ment. The plaintiff there had resigned from the Trainmen's Union and joined UROC, a rising competing union. The Trainmen requested the railroad to discharge Rychlik and this was done. UROC however was not a union national in scope eligible to elect members to the NRAB. What the Supreme Court said in dictum in that case was with respect to that factual situation.

The Trainmen also rely on Rohrer v. Conemaugh & Black Lick R. R. Co., 3 Cir., 359 F.2d 127, but the holding there was that Sec. 2 Eleventh(c) does not apply at all to a railroad which is wholly owned by a steel company, which is not organized according to crafts, and all of whose employees are represented by the United Steel Workers Union. The Trainmen cite no case where a union shop agreement negotiated by one of the five national operating craft unions was permitted to bar an employee from belonging to another national operating craft union as an alternative to belonging to the bargaining union.

We therefore reverse the judgment of the district court and remand for further proceedings consistent with the views expressed in this opinion.