Dennis T. DEMPSEY, Ronald E. Shaver, Raymond E. Young, et al., Plaintiffs–Appellants,

v.

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, United Transportation Union, and J.G. Bailey, as General Chairman of United Transportation Union, Defendants–Appellees.

No. 93–1085.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1993.

Decided Feb. 25, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied April 1, 1994.

6621 on substantial underpayments attributable    to tax-motivated transactions.

Harold A. Ross, Ross & Kraushaar, Cleveland, OH (argued), Marvin Gittler, Stephen J. Feinberg, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for plaintiffs-appellants.

J. Stephen Poor, David J. Rowland (argued), Seyfarth, Shaw, Fairweather & Geraldson, Patrick J. Harrington, Robert Earl Harrington, Jr., Harrington, Thompson, Acker & Harrington, Jr., Chicago, IL, Norton N. Newborn, Cleveland, OH, for defendants-appellees.

Before FLAUM and MANION, Circuit Judges, and REYNOLDS, District Judge.*

MANION, Circuit Judge.

In the midst of a threatened national railway strike, the plaintiffs, the Brotherhood of Locomotive Engineers (BLE), and eight engineers employed by Atchison, Topeka, and Santa Fe Railway Company (Santa Fe), filed suit to preliminarily enjoin the enforcement of a side letter agreement to a collective bargaining agreement executed between Santa Fe and the United Transportation Union (UTU). The challenged agreement required UTU members who wanted to accrue additional seniority to pay monthly dues to UTU even though they had transferred to an engineer position under the jurisdiction of the BLE. The district court denied plaintiffs' request for declaratory and injunctive relief, and granted summary judgment to UTU and judgment on the pleadings to Santa Fe. We affirm.

## I. Background

Santa Fe is an interstate railway carrier within the meaning of Section 1 of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* Like most railroads, Santa Fe has collective bargaining agreements with different unions who represent the various categories, or "crafts," of train employees. One such union is the UTU. UTU is the exclusive bargaining representative for the train service craft,[1] which includes Santa Fe's conductors, brakemen, and switchmen. BLE is the exclusive bargaining representative for the engine service craft, which consists of Santa Fe's engineers.

Santa Fe and UTU have long been parties to collective bargaining agreements. Under an agreement between Santa Fe and UTU, dated September 1, 1966, train service employees first obtained seniority through date of hire or first service in the craft and then maintained seniority standing by the terms of the collective bargaining agreement. The agreement also provided that even if an employee leaves the train service crafts for any period of time he would continue to accumulate seniority. Also, as is common in these railroad agreements, the 1966 Santa Fe–UTU agreement contained a union shop provision, that is, an agreement requiring as a condition of continued employment that employees join the union designated as their authorized bargaining representative. The agreement also provided that this union shop

* Hon. John W. Reynolds, District Judge for the Eastern District of Wisconsin, is sitting by designation.

1. We note that throughout the parties' briefs, as well as several materials included in the record, the terms "train service" and "ground service" are used interchangeably to refer to the same group of employees, notably, conductors, brakemen, and switchmen. For the sake of clarity, in referring to this group of employees, we will only use the label "train service."

provision is satisfied if the employee is a member of any labor organization national in scope organized in accordance with the RLA and which admits as members employees in the train service or engine service crafts. Thus, membership in the UTU or the BLE satisfied the union shop.

The question before us began in 1988, when Santa Fe, BLE, and UTU were parties to a round of negotiations between the nation's railroads and railway labor unions. Apparently the railroads, including Santa Fe, wanted to reduce the number of workers required on each train, known as the "crew consist." The parties were not so much in disagreement with the notion of reducing the crew as they were the method of achieving such reduction; the unions wanted to use attrition whereas the railroads wanted to reduce the excess employees' wages. The parties were unable to reach an agreement during these negotiations which led to threats of a nationwide strike on the part of the railway unions. To break this deadlock, then-President Bush, by Executive Order 12714, appointed the Presidential Emergency Board 219 to investigate the dispute and to report its findings. The Emergency Board reported, among other things, that the railroads had made a valid proposal to reduce the crew consist, but that the parties should bargain this matter locally, not nationally.

Despite the Emergency Board's recommendations, some of the railroads and unions were unable to reach agreement. As a result, eleven railroad unions, including UTU, went on strike against most of the nation's major railroads, including Santa Fe. To avert a nation-wide railway strike, the Congress, on April 18, 1991, passed Public Law Number 102–29 which made the recommendations of the Emergency Board binding upon the parties. In accordance with the legislated agreement, UTU and Santa Fe went back to the bargaining table and adopted a crew consist agreement on July 6, 1992. Under the agreement, UTU agreed to the elimination of certain train service positions and the separation of train service positions through buyouts. In addition to this agreement, UTU and Santa Fe also executed a side letter agreement to the crew consist agreement, known as Side Letter No. 11, which provided that train service employees who were transferred to engine service and who wished to continue accumulating additional seniority in train service, must pay monthly dues to the UTU.[2] Prior to the execution of Side Letter 11, seniority accumulated even when an employee in the train service craft was transferred to and joined a different union.

The BLE and eight engineers challenged the validity of Side Letter 11 and brought this action in the district court requesting preliminary as well as declaratory relief. According to plaintiffs, Side Letter 11 is illegal under Section 2 Eleventh (c) of the RLA because it effectively requires transferred train service employees to become members of multiple unions. As stated earlier, plaintiffs include four members of the UTU currently working in engine service who want to become members of the BLE, and four non-members of UTU who are already members of the BLE and are working in engine service. Plaintiffs argue that although their membership in the BLE should be sufficient to satisfy the 1966 UTU–Santa Fe union shop agreement, Side Letter 11 will effectively force them to also become members of the UTU if they wish to continue accruing se-

<hr>

**2.** The relevant portions of Side Letter 11 provided:

> Ground service employees who have transferred or transfer to engine service will not continue to accumulate ground service seniority unless they satisfy the following condition. Full dues to the United Transportation Union will be required of such employees in order for them to continue accumulating ground service seniority.
>
>      *     *     *     *     *     *
>
> Ground service employees failing to pay full monthly dues to the UTU after transferring to engine service, will not thereafter accumulate any additional conductors, brakeman or yardman seniority, and thus will fall on any relevant conductors', trainmen's or yardmen's roster below persons who do continue to accumulate such seniority.

R. 1, Ex. A.

niority in train service while working as engineers. This, according to plaintiffs, leads to a form of compulsory dual unionism expressly prohibited by the RLA. Plaintiffs also argue that Side Letter 11 violates Section 2, Third and Fourth of the RLA because it interferes with the workers' rights to organize and bargain collectively through the representatives of their own choosing. Finally, plaintiffs alleged that Side Letter 11 violated Article 51 of the UTU constitution.

The district court concluded that Side Letter 11 was valid and granted judgment on the pleadings to Santa Fe and summary judgment for UTU. With respect to plaintiffs' argument under Section 2 Eleventh (c), the court noted that nothing on the face of Side Letter 11 required transferred train service employees working in engine service to maintain membership in the UTU as a condition of continued employment in the train service craft. *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.,* No. 92 C 5365, 1992 WL 404488, slip op. at 6 (N.D.Ill., December 30, 1992). Instead, the court found that Side Letter 11 merely required payment of dues to UTU should a transferred train service employee wish to continue accruing train service seniority while working in engine service. *Id.* at 7. Next, the court found that the side letter agreement did not violate Section 2, Fourth.[3] The court observed that the original purpose behind Section 2, Fourth was to prevent unorganized employees from being forced into joining so-called "company unions" under the control of the railroad. Because plaintiffs were not unorganized employees, the only way they could invoke the protections of Section 2, Fourth would be if they could demonstrate that by enacting Side Letter 11, Santa Fe and UTU had struck "a fundamental blow to union or employer activity and the collective bargaining process itself." *Id.* at 12 (quoting *Trans World Airlines v. Indep. Fed'n of Flight Attendants,* 489 U.S. 426, 442, 109 S.Ct. 1225, 1235, 103 L.Ed.2d 456 (1989)). Using this standard,

the district court concluded that Side Letter 11's requirement of monthly dues to accrue additional seniority in the UTU was not a severe assault to the BLE and therefore did not rise to a violation of Section 2, Fourth. Having thus disposed of plaintiffs' federal claims, the district court concluded that it did not have supplemental jurisdiction over plaintiffs' state law claim regarding the violation of UTU's constitution. This timely appeal followed.

## II. Analysis

### A. Standard of Review

In its order, the district court stated that it had before it, and consequently granted, a motion by Santa Fe for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) and a motion by UTU for summary judgment pursuant to Fed.R.Civ.P. 56(c). However, after examining Santa Fe's "Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction And In Support Of Defendant Santa Fe's Motion For Judgment On The Pleadings," R. 24, it is clear to us that Santa Fe's motion was really one for summary judgment. For example, in the section of Santa Fe's memorandum entitled "Brief Statement of Facts," Santa Fe states that as support for its factual allegation, it was relying not only upon its complaint but also upon the affidavit of BLE's General Chairman, Charles A. McDaniel. *Id.* at 4. True to its word, throughout its memorandum Santa Fe frequently cites to the McDaniel affidavit; moreover, Santa Fe also directed the district court to an affidavit of UTU's General Chairman, J.G. Bailey, which had been filed in support of UTU's motion for summary judgment. Because Santa Fe presented to the district court matters which were outside the pleadings, Santa Fe's motion for judgment on the pleadings converted into a motion for summary judgment. *See* Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the

---

3. Although the plaintiffs in their complaint alleged violations of Section 2, Third, they advanced no argument before the district court in support of that claim. The district court considered this argument waived, *id.* at 4 n. 1, and so do we. *See e.g. Gray v. Lacke,* 885 F.2d 399, 409 (7th Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (failure to raise issue in the district court results in a waiver on appeal); *accord Amplicon Leasing v. Coachmen Industries, Inc.,* 910 F.2d 468, 471 (7th Cir.1991).

pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"); *see also English v. Cowell,* 10 F.3d 434, 437 (7th Cir. 1993) (in ruling on a dismissal for failure to state a claim, a district court may consider matters outside the pleadings if the motion is treated as a motion for summary judgment). This is not merely an academic exercise because later in our opinion we refer to certain affidavits, and given that we are treating UTU and Santa Fe the same for purposes of this appeal, any reference to affidavits, while usual and customary in the course of reviewing summary judgments under Rule 56, would be incompatible with a review of a judgment on the pleadings entered under Rule 12(c). Therefore, the district court should have denominated both of its orders as ones for summary judgment and this is how we shall treat them.

This being said, we review summary judgment orders *de novo,* viewing the record and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *See Anderson v. Stauffer Chemical Co.,* 965 F.2d 397, 400 (7th Cir.1992). A district court's grant of summary judgment is appropriate— in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In other words, the record must reveal that "no reasonable jury could find for the nonmoving party." *Anderson,* 965 F.2d at 400 (citing *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991)).

## B. Section 2, Eleventh (c) and Dual Unionism

Plaintiffs vigorously renew their contention that Side Letter 11 in word and in deed constitutes a form of compulsory dual unionism in violation of Section 2, Eleventh (c) of the RLA. The legislative background leading up to the enactment of Section 2, Eleventh (c) was succinctly set forth by Mr. Justice Harlan in *Pennsylvania Ry. Co. v. Rych-*

*lik,* 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1956).[4] When enacted in 1926, the RLA did not provide for union shop agreements. As stated earlier, a union shop agreement is one where, as part of the collective bargaining agreement between the employer and the union, newly-hired employees are required, as a condition of continued employment, to become a member of the authorized bargaining representative of their craft within a certain set period of time following their employment. In fact, in 1934, Congress, in an effort to combat company dominated unions, which were then prevalent on railroads, made union shop provisions illegal. *See Rychlik,* 352 U.S. at 489 n. 18, 77 S.Ct. at 426 n. 18. It was not until 1951 that Congress decided unions should be allowed to benefit from union shop agreements and, as a result, added Section 2, Eleventh (a) to the RLA. *Id.* at 489, 77 S.Ct. at 426. That provision, in relevant part, provides:

> [A]ny carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this Act shall be permitted—
>
> > (a) to make agreements, requiring, *as a condition of continued employment,* that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class....

45 U.S.C. § 152, Eleventh (a) (emphasis added). Congress enacted Section 2, Eleventh (a) to eliminate the free rider problem, specifically, that nonunion employees were enjoying the benefits obtained by the union's efforts in collective bargaining without having to pay any of the costs. *See Rychlik,* 352 U.S. at 489, 77 S.Ct. at 426.

In agreeing to authorize the union shop Congress was concerned what impact this would have vis-a-vis the intercraft mobility typically associated with the railroad industry. Labor in the railroad industry is orga-

---

**4.** While this background has little relevance when examining the plain meaning of the present statute, it does give an historic perspective to events and circumstances which led up to the current legislation.

nized largely by craft rather than industry. For example, the train service employees—engineers, firemen, trainmen, switchmen, and brakemen—are organized separately for collective bargaining purposes from the engine service employees. And, as in our case, these crafts are typically represented by different unions. Despite this organization along craft lines, seasonal shifts or a change in the railroad's needs for certain workers in one craft result in a certain amount of ebb and flow of individual employees between the different crafts. Thus, as in our case, a trainman could be promoted to serve temporarily as an engineer; when there is not enough work for engineers, the transferred trainman, being low man on the totem pole, would be returned to train service. But this shuttling back and forth between crafts can pose a dilemma for the transferred employee: upon being transferred to another craft he would be required by that craft's union shop agreement to belong to the union representing the new craft to which he has been promoted. He will then have to choose between becoming a member of two unions, which could be costly, or of quitting his old union upon transfer into the new craft, which could result in the loss of benefits and seniority. *See generally Rychlik*, 352 U.S. at 490, 77 S.Ct. at 426 (discussing historical background leading up to adoption and amendment of union shop provision in Section 2, Eleventh).

In order to eliminate this dilemma, Congress, in addition to enacting the union shop in Section 2, Eleventh (a), also offered an amendment which became Section 2, Eleventh (c). That provision provides in relevant part:

> The requirement of membership in a labor organization *in an agreement made pursuant to subparagraph (a) of this paragraph* shall be satisfied, as to both a present or future employee engaged in engine, train, yard, or hostling service ... if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership em-

ployees of a craft of class in any of said services....

45 U.S.C. § 152 Eleventh (c) (emphasis added). Therefore, Section 2, Eleventh (c) eliminated the possibility that the adoption of the union shop would lead to dual unionism, *i.e.,* being forced to join more than one union, or the necessity of changing from one union to another when an employee temporarily changed crafts. As explained by the Supreme Court:

> the sole aim of [Section 2, Eleventh (c)] was to protect employees from the requirement of dual unionism in an industry with high job mobility, and thus to confer on qualified unions the right to assure members employment security, even if a member should be working temporarily in a craft for which another union is the bargaining representative.

*Rychlik*, 352 U.S. at 489, 77 S.Ct. at 426.

█ Plaintiffs argue that Side Letter 11 on its face constitutes an illegal addition to the 1966 union shop provision between Santa Fe and UTU. Plaintiffs do not contend that the 1966 union shop provision between Santa Fe and UTU violates the RLA. Nor could they: the 1966 union shop provision tracks identical language found in Section 2, Eleventh (c) which provides that membership in a national union, such as UTU or BLE, satisfies the union shop requirements. What plaintiffs are apparently trying to contend is that by executing Side Letter 11, the otherwise valid union shop agreement has become invalid under Section 2, Eleventh (c). Now, according to plaintiffs, it is no longer enough to simply belong to UTU or BLE to satisfy the union shop requirement; rather, transferred trainmen who do not pay dues to UTU while working in engine service (where presumably they would be dues-paying members of the BLE) will lose seniority in the train service craft and, eventually, their jobs. This eliminates any incentive to join or to remain in the BLE. Thus, Side Letter 11 in effect leaves transferred train service employees no reasonable choice but to become members of the UTU (and not the BLE) in order to satisfy the union shop. As plaintiffs see it, this flies in the face of Section 2,

Eleventh (c).[5]

But by jumping into how Side Letter 11 violates Section 2, Eleventh (c), BLE, in the words of the district court, has "put the proverbial cart before the horse." As stated above, Section 2, Eleventh (c) is only a limitation on Section 2, Eleventh (a)'s general authorization of the union shop under the RLA. In other words, the prohibitions against dual unionism contained in Section 2, Eleventh (c) only kick in when the agreement at hand purports to be a union shop agreement made pursuant to Section 2, Eleventh (a). As noted by the district court, however, there is nothing on the face of Side Letter 11 which establishes any conditions of continued employment in the train service craft upon the making of monthly payments to the UTU. Nor, for that matter, does Side Letter 11 require the payment of dues to UTU in order to preserve already-acquired seniority in train service. *Cf. N.L.R.B. v. Manitowoc Engineering Co.*, 909 F.2d 963, 969–71 (7th Cir.1990), *cert. denied*, 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991) (requiring transferred or promoted employees to maintain union membership in order to retain seniority *already earned* constitutes impermissible discrimination under § 8(a)(3) of the NLRA). Instead, Side Letter 11 merely requires that a transferred train service employee must pay dues to UTU if he wants to accrue *additional* train service seniority while working outside train service. If he chooses not to make the payments, and chooses instead to make payments to BLE, he will not accumulate *additional* train service seniority while working outside that craft, but he still satisfies the Santa Fe–UTU union shop requirements, and as such, cannot be terminated for failing to comply with its terms. Because Side Letter 11 does not create any conditions of continued employment in train service, it is not a union shop agreement pursuant to Section 2, Eleventh (a) at all, much less an illegal one under Section 2, Eleventh (c). Therefore, we agree

with the district court that, as a matter of law, this Side Letter agreement entered into between Santa Fe and UTU is wholly outside the realm of Section 2, Eleventh (c).

Notwithstanding the above, plaintiffs assert that the "clear and unequivocal" language of Section 2, Eleventh (c) indeed does prohibit Santa Fe and UTU from entering into any agreement such as Side Letter 11. In support, they point to the last proviso of Section 2, Eleventh (c), which states:

> *Provided, further,* that nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

45 U.S.C. § 152 Eleventh (c) (emphasis in original). Plaintiffs maintain that this language absolutely guarantees transferred train service employees the right to change their union membership to BLE without being out of compliance with the Santa Fe–UTU union shop requirements. Br. at 38. But despite these efforts, plaintiffs still have not shown how anything on the face of Side Letter 11 comes close to resembling a union shop agreement. Section 2, Eleventh (c) cannot be conveniently dissected into a few seemingly favorable clauses. From its very first sentence ("The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph"), this section makes it unmistakably clear that it is only a limitation upon those agreements which require membership in a union as a condition of continued employment—union shop agreements. Because plaintiffs have failed to make any cogent argument as to how Side Letter 11 forces transferred employees to join multiple unions *as a condition of continued employment,* Section 2, Eleventh (c) is simply inapplicable.[6]

---

**5.** Plaintiffs also object to the district court's characterization of these payments as monthly dues as compared to membership in UTU. This distinction is irrelevant in light of the critical issue before this court, which is whether or not these payments were a condition of continued employment.

**6.** We further agree with the district court that the authority plaintiffs rely upon in making their point, to wit, *Felter v. Southern Pacific Co.*, 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959), *Birkholz v. Dirks*, 391 F.2d 289 (7th Cir.1968), *vacated as moot*, 395 U.S. 210, 89 S.Ct. 1767, 23 L.Ed.2d 213 (1969), and *O'Connell v. Erie Lacka-*

Having thus failed in their facial challenge to Side Letter 11, plaintiffs, relying largely upon an affidavit sworn to by BLE's General Chairman, Charles McDaniel, Jr., make the argument that the dues requirement in Side Letter 11 results in a *de facto* condition of employment. To better understand this argument it is necessary to understand how a trainman becomes and remains an engineer. In 1985, UTU and Santa Fe entered into a national agreement which made the train service craft the main source of supply for new engineers. When a train service worker is promoted to engineer, he becomes a junior engineer. When there is not enough work for engineers, those junior in seniority will return to train service. If there is also a shortage of work in train service, and if the worker does not have enough train service seniority to survive layoffs in that craft, then he will be furloughed until there is work available in either craft. And if furloughed for a year, the engineer will lose all of his train service seniority. *Id.* at 3. Plaintiffs argue that, under present business conditions, employees have no choice but to pay dues to UTU if they do not want to find themselves unemployed because they dropped in seniority in train service (in relation to others who did not transfer and continued accruing seniority) while working outside that craft.

In making this argument, BLE is essentially asking this court for a determination that Section 2, Eleventh (c) somehow guarantees transferred employees the right to continue accruing seniority. Yet it is well-established that, barring some legislative pronouncement to the contrary, seniority rights arise out of the collective bargaining agreement entered into between the employer and the union. *See Aeronautical Lodge v. Campbell,* 337 U.S. 521, 526, 69 S.Ct. 1287, 1289, 93 L.Ed. 1513 (1949); *Trailmobile Co. v. Whirls,* 331 U.S. 40, 53 n. 23, 67 S.Ct. 982, 988 n. 23, 91 L.Ed. 1328 (1946); *see also Elder v. New York Central Ry. Co.,* 152 F.2d 361, 364 (seniority rights arise out of collective bargaining agreement between employees and the employer); Robert A. Gorman, Labor Law 540 (1976) (labor contracts contain, among other things, provisions for employee security). Of course any entitlements established by the collective bargaining agreement, including seniority rights, are generally subject to modification or expiration. *See Senn v. United Dominion Indust. Inc.,* 951 F.2d 806, 816 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993) (citing *Merk v. Jewel Companies, Inc.,* 848 F.2d 761, 763 (7th Cir. 1988), *cert. denied,* 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988)); *see also McMullans v. Kansas, Oklahoma and Gulf Ry. Co.,* 229 F.2d 50, 53 (10th Cir.), *cert. denied,* 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956) ("those who acquired seniority rights under a contract are bound by the possibility that the contract may be changed, and the rights thereunder revised or abrogated"). In short, employees, such as those employed under the Santa Fe–UTU collec-

wanna R.R., 391 F.2d 156 (2d Cir.1968), *vacated as moot,* 395 U.S. 210, 89 S.Ct. 1767, 23 L.Ed.2d 213 (1969), is inapposite. For example, in *Felter,* the Supreme Court held that the union and the railroad violated Section 2, Eleventh (*b*)—a provision allowing the railroad unions to make "check off" agreements with the carrier for the deduction from a member employee's wages of periodic dues, initiation fees, and assessments, *see* 45 U.S.C. § 152 Eleventh (b)—by preventing employees from changing union membership unless they did so on the official form provided by the union. *Felter,* 359 U.S. at 337–38, 79 S.Ct. at 855. Thus, this case has no bearing whatsoever on the applicability of Section 2, Eleventh (c). In *Birkholz,* this circuit did discuss the applicability of Section 2, Eleventh (c) when it held that the union and the railroad had entered into an invalid union shop agreement that only permitted membership in a labor union national in

scope and *having contracts with the same railroad. See Birkholz,* 391 F.2d at 291–92. But unlike Side Letter 11, the agreement at issue in *Birkholz* clearly was a union shop agreement, *i.e.,* one creating conditions of continued employment, and therefore was within the scope of Section 2, Eleventh (c). Similarly, in *O'Connell,* the Second Circuit held that the union shop agreement between the railroad and the sole union representing all of its employees violated Section 2, Eleventh (c) because it required all employees to become members of that union, notwithstanding their membership in another operating union that was national in scope. *O'Connell,* 391 F.2d at 162–3. Like *Birkholz, O'Connell* dealt with an agreement which was unmistakably a union shop provision; and again, because Side Letter 11 is not, this case is inapposite.

tive bargaining agreement, "have no vested right in the seniority created by [that] contract and the RLA does not undertake to guarantee them a job for life." *McMullans,* 229 F.2d at 53. There is nothing in the language of Section 2, Eleventh (c) which purports to guarantee a transferred employee the right to continue accruing seniority in a craft other than the one in which he is currently employed. What the RLA *does* guarantee, at least with respect to Section 2, Eleventh (c), is that transferred employees will not be forced to join multiple unions. And as we have previously shown, the Santa Fe–UTU union shop is satisfied if employees are members of either BLE or UTU. There is no doubt that Side Letter 11 has provided an additional benefit to those transferred train service employees who choose to pay dues to the UTU: the continued accrual of seniority. It may very well be that this will tempt transferred trainmen who currently are members of BLE to satisfy their Santa Fe–UTU union shop obligations by paying their monthly dues to UTU. This is not the same, however, as being forced to do so as a condition of continued employment. Therefore, the district court correctly concluded that, as a matter of law, nothing in the language or even the purposes behind Section 2, Eleventh (c) indicates that Side Letter 11 is prohibited under the RLA.

BLE finally argues that upholding Side Letter 11 would upset the cost-sharing scheme that is evident in Section 2, Eleventh (c). Under Section 2, Eleventh (c) alternate membership in a national union is limited to those unions which qualify under 45 U.S.C. § 153 First of the RLA as electors of the union representatives on the National Railroad Adjustment Board (NRAB), the agency designed to settle disputes arising under collective bargaining agreements. *See Rychlik,* 352 U.S. at 485, 77 S.Ct. at 423. This requirement ensures that membership in satisfaction of a union shop will be confined to those unions which share the costs of administering the NRAB, and which join together in other respects in the negotiating and policing of collective bargaining agreements under the dispute mechanisms of the RLA. BLE does not contend, nor can it, that UTU does not qualify under Section 3, First of the

Act. In fact, in its brief, BLE unequivocally states that "membership in either BLE or UTU is regarded as adequate support for collective bargaining activities." Br. at 43. If this is the case, then BLE's contention is contradictory. BLE, however, tips its hand at what it's really arguing for, when, in the next sentence of its brief, it asserts that "Side Letter 11 destroys this scheme and was entered into with the intent of upsetting the financial support for BLE's collective bargaining activities." *Id.* Translation: Side Letter 11 deprives us of our "fair share" of contributions which go towards the support of the NRAB. There is no provision under the RLA which guarantees qualifying unions that they will receive a certain set amount of dues to offset their obligations to the NRAB. The RLA does not attempt to provide financial security to labor organizations through some sort of redistribution of membership dues. Therefore, this additional argument against Side Letter 11 is groundless.

## C. Section 2, Fourth

■ Plaintiffs argue that even if Side Letter 11 is not an illegal union shop agreement in violation of Section 2, Eleventh (c), it nevertheless constitutes unlawful interference and coercion in an effort to induce them to place their membership with BLE instead of UTU. As support for this argument, plaintiffs point to Section 2, Fourth of the RLA which, in pertinent part, provides:

> No carrier, its officers or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, ... *or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization ....*

45 U.S.C. § 152 Fourth (Section 2, Fourth) (emphasis added). In their brief, however, plaintiffs step away from the statute at hand and instead rely primarily on case law interpreting Section 8(a)(3) of the National Labor Relations Act, using the language of that

provision as a shroud to cover the shortcomings of Section 2, Fourth. While the Supreme Court has observed that the NLRA may provide helpful analogies for interpreting the RLA, *see Trans World,* 489 U.S. at 432, 109 S.Ct. at 1229, the Court has also emphasized that "the NLRA cannot be imported wholesale into the railway labor area." *Id.* at 439, 109 S.Ct. at 1233. This is especially true where, as in our case, we are not faced with such a paucity of precedent under the RLA that we must leapfrog over that provision and proceed immediately into the NLRA. Quite to the contrary, we need not resort to the NLRA at all, for applicable case law under the RLA is sufficient for our determination that Side Letter 11 is not barred by Section 2, Fourth.

Section 2, Fourth was enacted as part of the 1934 amendments to the RLA. From the start, the Supreme Court has viewed the 1934 amendments "as addressing primarily the *precertification* rights and freedoms of unorganized employees" so that they could "organize and [choose] their [own] representative without the coercive interference and pressure of a company union." *Trans World,* 489 U.S. at 440, 109 S.Ct. at 1234 (citations omitted) (emphasis added). This precertification emphasis makes sense in light of the framework of the RLA. Congress enacted the RLA in 1926 in order to prevent, among other things, disruptions in interstate commerce caused by labor disputes in the railway industry. 45 U.S.C. § 151a. The RLA achieves this purpose by setting forth an exhaustive and detailed framework for resolving disputes between railroads and their employees involving union representation or contract formation, known as "major disputes," or those involving grievances and the interpretation of collective bargaining agreements, known as "minor disputes." *See Consolidated Rail v. Ry. Labor Executive Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2479, 105 L.Ed.2d 250 (1989). Without the initial assurance provided for in the 1934 amendments that "the employees' putative representative is not subject to control by the employer," *Trans World,* 489 U.S. at 441,

109 S.Ct. at 1234, the effectiveness of the RLA's private dispute resolution procedures would be undermined, with the result that the parties, instead of remedying their differences through the RLA's administrative means, would consistently be "enlist[ing] the courts to further [their] own partisan ends." *Id.*

As noted by the district court, however, plaintiffs are not unorganized workers but members of one of the two labor organizations which already serve as the exclusive bargaining unit representatives for a particular craft. Does this render Section 2, Fourth automatically inapplicable to the case at hand? Not necessarily. In situations such as ours, known as "post-certification" controversies, Section 2, Fourth has been interpreted as providing protection where the plaintiff can show that the employer's actions "strike a fundamental blow to union or employer activity and the collective bargaining process itself." *Trans World,* 489 U.S. at 442, 109 S.Ct. at 1235. Typically, these post-certification controversies take place during a period in which deadlocked parties resort to what is known as "self-help." This occurs when the employer and the union have exhausted any attempts to resolve their major disputes through mediation and arbitration. At that point they resort to whatever various forms of peaceful economic power they can muster to continue the carrier's operations, and at the same time, cause one of the parties to relent and reach a settlement. With respect to this final stage of a labor dispute, "the Act is wholly inexplicit as to the scope of allowable self-help" available to the parties once the RLA's major dispute resolution procedures have been exhausted. *Trans World,* 489 U.S. at 442, 109 S.Ct. at 1235. The only basis for judicial intervention pursuant to Section 2, Fourth at this stage is when either side to the dispute has employed self-help measures that are "inherently destructive of union or employer activity." *Id.; see also Renneisen v. American Airlines, Inc.,* 990 F.2d 918, 922 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993).[7]

---

**7.** As we recently stated in *Renneisen:* "TWA offered this phrase to help courts analyze the mer-

its of self-help actions, and not to determine if a

In support of their motions for summary judgment below, both Santa Fe and UTU relied on the affidavit of UTU's General Chairman, Mr. J.G. Bailey, as direct evidence of the absence of anti-union animus with respect to Side Letter 11. In his affidavit, Mr. Bailey attested:

3. There was no purpose or intent in making that agreement to undermine Brotherhood of Locomotive Engineers as bargaining representative for the engineer craft of employees on the Santa Fe. Nor did the Santa Fe have any such intent or purposes in making the agreement.

4. The purpose of the July 6, 1992 agreement was to have employees who hold train service seniority, but go to work outside the craft in engine service, contribute financial support to the labor organization that enforces the train service craft seniority agreements and protects that absent employee's seniority and his right to come back to train service in the event of layoff in engine service. This is a valuable right and UTU protects it while that employee is transferred.

At this point, it was up to plaintiffs, as the non-moving party, to put forward some evidence sufficient to establish the existence of a genuine dispute regarding the purposes behind Side Letter 11—an element on which plaintiffs bore the burden of proof at trial. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; Fed.R.Civ.P. 56(e). But from our examination of plaintiffs' lengthy document entitled "Memorandum in Opposition to Defendant UTU's Motion for Summary Judgment and Defendant Santa Fe's Motion for Judgment on the Pleadings," we see no mention of any evidence to rebut Santa Fe's and UTU's showing of no anti-union animus; in fact, we see no mention of this element at all. While inundating the district court with endless analogies to the NLRA, the plaintiffs chose not to address the requirements for a valid claim under Section 2, Fourth of the RLA.

Nevertheless, we have examined the entire record before the district court and have come up with what we consider to be the only evidence in favor of the plaintiffs which has any relevance towards controverting the

court has jurisdiction in the first instance." *Ren-*

showing of no anti-union animus. Plaintiffs submitted an affidavit of BLE's General Chairman Charles A. McDaniel, in which he asserts:

Contrary to the statement contained in paragraph 3 of UTU General Chairman J.C. Bailey's affidavit, Side Letter No. 11 does undermine the Brotherhood of Locomotive Engineers as bargaining representative for the engineer craft of employees on Santa Fe. How he would know that Santa Fe did not have any such intent or purpose, as he asserts in the same paragraph, is beyond me.

On their face, however, these statements do no more than offer conclusory statements unsupported by one shred of specific facts. As such, these conclusory statements were insufficient to create a genuine issue of triable fact. *See First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985); *Hall v. Printing & Graphic Arts Union*, 696 F.2d 494, 500 (7th Cir.1982); *accord* 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2738 at 486–88 (1983). Put simply, these comments by McDaniel were non-responsive to evidence of no animus put forward by UTU and Santa Fe and therefore do not create a genuine issue of triable fact for purposes of summary judgment.

Moreover, in light of the collective bargaining agreements between Santa Fe and UTU we see no anti-union animus reflected in Side Letter 11. As the reader recalls, under the original 1966 Santa Fe–UTU collective agreement, transferred trainmen were able to accrue additional seniority without having to pay monthly dues to UTU. Things changed, however, when, in 1992, UTU agreed to Santa Fe's crew consist reduction, which resulted in the loss of employees from UTU's membership roster. It was obvious that with this shrinking membership base, UTU could not afford to let transferred employees accrue additional seniority and at the same time not pay dues. Thus, the purpose behind Side Letter 11 was to ensure that those who continue to accumulate additional train service seniority while working outside

*neisen*, 990 F.2d at 922–23.

that craft should contribute to support administration of the train service labor agreements and the UTU which had the responsibility for protecting train service seniority and seniority agreements. We see nothing on the face of Side Letter 11 which indicates that the parties were focusing on BLE, much less that they were somehow conspiring to undermine its bargaining status.

Putting this aside, we fail to see how Side Letter 11 is the draconian measure that plaintiffs make it out to be.[8] Side Letter 11 neither terminates nor penalizes anyone for joining or failing to join a union. We agree with the district court that this side letter agreement entered into between Santa Fe and the UTU constituted a less severe assault upon the BLE in comparison to other measures upheld by the courts, measures which were unilaterally adopted by employers, and which directly targeted specific unions. *See, e.g., Trans World,* 489 U.S. at 443, 109 S.Ct. at 1235 (airline's policy of retaining junior crossover strikers over full-term strikers held lawful under Section 2, Fourth); *Renneisen,* 990 F.2d at 924–25 (agreement entered into between airline and pilots' union, which relinquished wages and benefits for future pilots and preserved wages and benefits for current pilots, held lawful under Section 2, Fourth); *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists,* 915 F.2d 43, 46–7 (1st Cir.1990) (disciplinary investigation of three union representatives held lawful under Section 2, Fourth); *Int'l Ass'n of Machinists v. Alaska Airlines, Inc.,* 813 F.2d 1038, 1039 (9th Cir.1987), *cert. denied,* 484 U.S. 926, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987) (airline's establishment of recall plan that gave priority for new jobs to replacements and crossover strikers over full-term strikers held lawful under Section 2, Fourth). In sum, we conclude that Side Letter 11 was nothing more than a lawful exercise of peaceful economic power that Santa Fe and UTU "were free to deploy once the parties had exhausted the private dispute resolution

mechanisms of the RLA." *Trans World,* 489 U.S. at 443, 109 S.Ct. at 1235. We therefore agree with the district court that Side Letter 11, as a matter of law, did not constitute an attack on the BLE or the collective bargaining process as prohibited by Section 2, Fourth.

### III. Conclusion

The side letter agreement executed between Santa Fe and UTU was a lawful means of self-help the parties were free to employ once they had exhausted the dispute resolution mechanisms of the RLA. Because it does not make the payment of monthly dues to UTU a condition of continued employment, it by definition is not a union shop agreement, and therefore is wholly outside the scope of Section 2, Eleventh (c). Neither was it motivated by anti-union animus directed at BLE, nor an attempt to interfere with the collective bargaining process, which places it outside the reach of Section 2, Fourth. Therefore, Side Letter 11 does not violate the RLA. Accordingly, the orders of the district court are

AFFIRMED.

REYNOLDS, District Judge, concurring.

I agree with all aspects of the majority decision except its conclusion "that Side Letter 11, as a matter law, did not constitute an attack on the BLE" within the meaning of the anti-influence provision of RLA Section 2, Fourth. Because the record contains so little evidence on the purpose or probable effect of the side letter, my view is that this claim should have been dismissed solely on the ground that plaintiffs failed to adduce specific facts in support of it. *See* Fed. R.Civ.P. 56(e).

---

8. As an aside, it would seem that the phrase "anti-union animus" refers to an employer's general hostility towards union activity. Here, Santa Fe did not demonstrate anti-union hostility; in fact, it dealt favorably with a union, UTU, in executing Side Letter 11. ·BLE has not presented us with, nor have we found, a similar case in which an employer, whose employees are represented by more than one union, strikes a deal which "prefers" or "favors" one union over another. But, inasmuch as this matter is not dispositive to our analysis, we need not pursue it further.