# United States Court of Appeals
## For the First Circuit

No. 04-2409

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,

Plaintiff, Appellee,

v.

GUILFORD TRANSPORTATION INDUSTRIES, INC., ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]
[Hon. James R. Muirhead, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge, and
Cyr, Senior Circuit Judge.

William G. Miossi, with whom Joseph E. Schuler, Eric L. Hirschhorn, Winston & Strawn, R. Matthew Cairns, and Ransmeier & Spellman were on brief, for appellants.
Marcus C. Migliore, with whom Julie P. Glass was on brief, for appellee.

February 28, 2005

**SELYA**, <u>Circuit Judge</u>. Plaintiff-appellee Air Line Pilots Association (ALPA) brought this action under the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188, seeking to enjoin the defendants from engaging in what ALPA described as "a brazen and apparently successful effort to destroy a union," Appellee's Br. at 3, by transferring work from a unionized firm to its non-unionized corporate sibling. A magistrate judge found that a major dispute existed as that term is used in the jurisprudence of the RLA and further found that the defendants had engaged in prohibited conduct. He therefore recommended the imposition of a preliminary injunction. The district court concurred and issued the requested injunction. Concluding, as we do, that the court did not apply the correct legal standards, we vacate the injunction and remand for further proceedings consistent with this opinion.

## I.  THE STATUTORY SCHEME

When Congress envisioned a need to create a separate labor regime for railroads in order to mitigate the potential for disruption of interstate travel and transportation of goods, it conceived the RLA. <u>See</u> <u>Detroit & Toledo Shore Line R.R. Co.</u> v. <u>United Transp. Union</u>, 396 U.S. 142, 148-49 (1969). It subsequently extended this regime to the airline industry. <u>See</u> Act of April 10, 1936, 49 Stat. 1189. The RLA now regulates the relationship between labor and management in both industries.

2

The RLA evinces a strong preference for alternative dispute resolution and sharply limits judicial involvement in labor disputes. See Tex. & New Orleans R.R. Co. v. Bhd. of Ry. & S.S. Clerks, 281 U.S. 548, 562-65 (1930). One manifestation of this bias is that, to the extent any such dispute involves the interpretation of an existing collective bargaining agreement (CBA), it must be submitted to binding arbitration. See 45 U.S.C. § 184; see also Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n, 491 U.S. 299, 303-04 (1989) (Conrail). Even when a dispute goes beyond the parameters of the CBA, the RLA requires union and management to engage in an elaborate set of mediation procedures. See 45 U.S.C. §§ 155, 183. While this pavane is in progress, both parties must maintain the status quo ante concerning rates of pay, working conditions, and the like. Conrail, 491 U.S. at 302-03. Only at the conclusion of the mediation process may the parties resort to self-help. Id. at 303.

The Supreme Court has denominated disputes that touch upon the proper interpretation of a CBA as "minor," and has made it pellucid that courts have no jurisdiction in such cases. Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 723-24 (1945). A dispute is considered minor whenever the challenged conduct is "arguably justified" either by the text and negotiating history of the CBA or by the past practices of the parties. Conrail, 491 U.S. at 307. Disputes falling outside the purview of the CBA are termed

3

"major."  Burley, 325 U.S. at 723-24.  In such cases, a federal court may enjoin the parties to maintain the status quo while the RLA's mediation process is ongoing.  Conrail, 491 U.S. at 303. Once the mediation procedures have concluded, the court must vacate any injunction.  See id.

The RLA contemplates the existence of two other types of disputes.  A representational dispute involves a union's claim to be the lawful representative of certain employees.  Air Line Pilots Ass'n, Int'l v. Tex. Int'l Airlines, Inc., 656 F.2d 16, 19 (2d Cir. 1981).  In those cases, decisional authority is vested in the National Mediation Board.  45 U.S.C. § 152, Ninth.  Courts have no jurisdiction to adjudicate representational disputes involving railroads or airlines.  See Tex. Int'l, 656 F.2d at 19.

Another type of dispute concerns allegations that an employer's conduct interferes with employees' rights to organize and designate an exclusive bargaining agent.  Such organizational disputes implicate 45 U.S.C. § 152, Third and Fourth.  Those provisions bar covered employers from meddling in, coercing, or unduly influencing employees' representational choices and from interfering with the right to unionize.  Atlas Air, Inc. v. Air Line Pilots Ass'n, 232 F.3d 218, 224 (D.C. Cir. 2000).  In contrast to other species of RLA cases, the courts have jurisdiction to decide certain questions concerning these statutory rights.  See, e.g., Ry. Labor Execs.' Ass'n v. Boston & Me. Corp., 808 F.2d 150,

4

157 (1st Cir. 1986). If a court finds a statutory violation, it may issue injunctive relief. See, e.g., id. at 158-59. Such relief is appropriate primarily in precertification disputes regarding employees' choice of union representatives and participation in the collective bargaining process. See TWA, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 440-41 (1989). We have, however, contemplated that postcertification relief may be appropriate in extremely limited circumstances. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 234 (1st Cir. 1996) (dictum).

## II. THE CASE AT BAR

In 1999, Guilford Transportation Industries, Inc. (Guilford) formed a wholly-owned subsidiary, Pan American Airlines, Inc. (PAA), as a repository for the acquired assets of a bankrupt airline. PAA placed those assets in a wholly-owned subsidiary, Pan American Airways Corp. (Pan Am), which began offering commercial airline service aboard a fleet of leased Boeing 727 jet aircraft. Over time, Pan Am's service graduated from charter flights to scheduled flights originating at airports on the East Coast and in the Caribbean.

From the beginning, Pan Am's airplanes were flown by the pilot force of its bankrupt predecessor. Pan Am and the pilots' union — ALPA — entered into a CBA on November 15, 1999. At its high point, Pan Am employed approximately ninety pilots. The skies

were not friendly, however, and by August of 2004 that number had shrunk to thirty.

Finances explain this reduction in force. The record shows that Pan Am lost tens of millions of dollars over approximately five years. These losses took a toll, and Pan Am informed federal regulators in June of 2004 that it would cease all flight operations on October 31, 2004. Pan Am hewed to that line and is now in the process of winding up its affairs.

There is, however, more to the story. In 1999, PAA formed a second wholly-owned subsidiary, Boston-Maine Airways Corp. (Boston-Maine). Boston-Maine, a commercial airline, employs only non-union pilots. Initially, it operated a fleet of small aircraft that included two CASA-212 turboprop cargo planes and ten Jetstream 3100 nineteen-seat passenger aircraft.

Boston-Maine had higher aspirations and, in 2002, it applied to the United States Department of Transportation and the Federal Aviation Administration (FAA) for permission to fly Boeing 727 aircraft. Despite ALPA's vigorous opposition, the federal regulators approved the application. Boston-Maine began operating 727s in commercial service in the summer of 2004 and Pan Am thereafter contracted with Boston-Maine to fly certain Pan Am routes. That move triggered the commencement of the instant

action.  In its complaint, filed on September 1, 2004,[1] ALPA alleged that Boston-Maine's development of the capacity to fly 727s, coupled with its subsequent contracting with Pan Am (resulting in the transfer of certain work from Pan Am to Boston-Maine), contravened both the CBA and the unionized pilots' statutory rights.

Simultaneous with the filing of its complaint, ALPA moved for temporary and preliminary injunctive relief seeking, inter alia, to prohibit Boston-Maine from operating large aircraft (including 727s) in commercial service while ALPA and Pan Am negotiated changes to the CBA.  The district court referred the motion to a magistrate judge.  See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).  Following a two-day evidentiary hearing, the magistrate judge recommended that the court characterize the dispute as major, reasoning that Pan Am and Boston-Maine should be treated as a single entity and that the CBA could not plausibly be interpreted to justify Pan Am's use of Boston-Maine to operate flights that otherwise would be flown by ALPA-represented pilots. The magistrate judge also recommended a finding that Pan Am and Boston-Maine had violated the unionized pilots' statutory rights because the attempted creation of a parallel 727 operation constituted an effort to interfere with the statutorily protected

_____

[1]ALPA named Guilford, Boston-Maine, and Pan Am as defendants, but not PAA.  The omission is fribbling, and nothing turns on it.

right to union representation. See Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc., No. 04-331, 2004 WL 2203570 (D.N.H. Sept. 17, 2004).

The district court spurned the defendants' timely objections and adopted the magistrate judge's report "in its entirety."[2] Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc., No. 04-331, 2004 WL 2318478, at *12 (D.N.H. Oct. 13, 2004). On the same date, the court issued a preliminary injunction ordering the defendants

> 1. To restore to the status quo rates of pay, rules and working conditions of the Pan Am flight crew members as they existed on July 15, 2004, including but not limited to, all those embodied in the collective bargaining agreement between Pan Am and ALPA, until all required bargaining, mediation and dispute resolution procedures of the Railway Labor Act are exhausted.
>
> 2. To refrain from using Boston-Maine, or any other affiliated operation, to operate [Boeing]-727s or any other large jet aircraft in service traditionally performed by Pan Am and that Pan Am is capable of performing.
>
> 3. To refrain from transferring to Boston-Maine any aircraft from the Pan Am certificate to the Boston-Maine certificate.

Two days later, the district court rebuffed the defendants' motion for a stay.

---

[2]Inasmuch as the district judge adopted the findings of the magistrate judge, we take an institutional view and refer to those findings as the findings of the district court.

8

The defendants promptly brought this interlocutory appeal, see 28 U.S.C. § 1292(a)(1), and requested an appellate stay. We denied that request on October 22, 2004, but expedited the appeal. Following briefing and oral argument, we took the matter under advisement on December 7, 2004.

## III. STANDARD OF REVIEW

We review the district court's issuance of a preliminary injunction for abuse of discretion. Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004). In doing so, we exercise de novo review as to the lower court's conclusions of law, while accepting its findings of fact to the extent that those findings are not clearly erroneous. Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004).

Whether a preliminary injunction should issue usually depends upon a medley of four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). Although the district court must consider all four factors, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that he is likely to succeed in his quest, the

9

remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

ALPA argues that this four-part inquiry does not apply in full flower to disputes under the RLA and, specifically, that a showing of irreparable harm is not a condition precedent to preliminary injunctive relief in such cases. This argument rests on Supreme Court dictum. See Conrail, 491 U.S. at 303 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.").[3] Some courts have given full allegiance to this dictum. See, e.g., CSX Transp., Inc. v. Bhd. of Maint. of Way Employees, 327 F.3d 1309, 1320 (11th Cir. 2003); United Transp. Union v. Kansas City So. Ry. Co., 172 F.3d 582, 585 (8th Cir. 1999). This court, however, has held, post-Conrail, that the Norris-LaGuardia Act applies to injunctions issued under the RLA, Int'l Ass'n of Machinists v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991), and that statute explicitly requires a showing of irreparable injury, see 29 U.S.C. § 107 (limiting jurisdiction to issue injunctive relief in cases growing out of labor disputes to those involving a threat of "substantial and irreparable injury").

---

[3]It is unclear whether the Court's dictum referred to all injunctions issued under the RLA or merely to status quo injunctions issued in the context of major disputes.

10

We find it unnecessary to resolve this apparent tension today. In the last analysis, this appeal turns on the likelihood of success, so we leave for another time the extent to which a showing of irreparable harm is a necessary precondition for preliminary injunctive relief under the RLA.

## IV. ANALYSIS

Although ALPA has lumped its grievances together, we think it is useful to envision the challenged conduct as comprising two practices: contracting out and diversion of business. By contracting out, we mean Pan Am's contracting with Boston-Maine to fly certain Pan Am flights after Boston-Maine had developed a large aircraft service. By diversion of business, we mean Pan Am's decision to cease all operations while Boston-Maine, having developed a large aircraft service, continues to fly 727s over at least some of Pan Am's wonted routes. We address these practices sequentially. Before doing so, however, we pause to mention the doctrine of corporate veil-piercing.

### A. Veil-Piercing.

ALPA suggests that the corporate veils that separate Guilford, Pan Am, and Boston-Maine should be pierced and the three companies treated as a single entity. ALPA's effort to frame the dispute in these terms stems from its overly expansive reading of our decision in an earlier RLA case, namely, Brotherhood of Locomotive Engineers v. Springfield Terminal Railway Co., 210 F.3d

11

18 (1st Cir. 2000). Although we deemed it prudent there to make a veil-piercing inquiry, see id. at 25-33, such an inquiry will be superfluous in many (perhaps most) RLA cases. We explain briefly.

If a company has two healthy subsidiaries — one unionized and one not — an attempt to shift work from the former to the latter could, depending upon the terms of the CBA, raise a contract dispute susceptible to arbitration. Such a dispute would be beyond the reach of our jurisdiction and, thus, no judicial inquiry — veil-piercing or otherwise — would be necessary.

Of course, the diversion of work from a unionized subsidiary to a non-union one also might constitute a major dispute (if, say, the matter were not addressed by either the terms of the CBA or prior custom and usage between the parties). In that case the mediation processes of the RLA would come into play. This scenario, like the first scenario, does not engender any need for a veil-piercing analysis; the appropriate inquiry is simply a matter of whether the two subsidiaries are commonly owned. See Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 275-76 (1965); Burlington N. R.R. Co. v. United Transp. Union, 862 F.3d 1266, 1275 (7th Cir. 1988).

We do not wish to paint with too broad a brush. While a separate veil-piercing analysis will prove unnecessary in many cases, we recognize that, in certain situations, such an analysis may be appropriate. That would include, for example, situations in

12

which an employer attempts to use a dummy corporation to avoid its collectively bargained obligations. See, e.g., NLRB v. W. Dixie Enters., Inc., 190 F.3d 1191, 1194 (11th Cir. 1999) (applying this principle in a National Labor Relations Act (NLRA) case); NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50-53 (1st Cir. 1994) (similar).

Here, however, ALPA has made no allegation that either Pan Am or Boston-Maine is a sham, and the facts in the record belie any such possibility. Accordingly, we can eschew any detailed veil-piercing discussion in this case. Instead, we emulate the Supreme Court's approach and accept that Guilford, Pan Am, and Boston-Maine are commonly controlled and that Pan Am may not use its corporate affiliates as a means of evading its obligations under either the CBA or the RLA. See Springfield Terminal, 210 F.3d at 29-30, 32 n.7.

## B. Contracting Out.

With respect to contracting out, the first step in our analysis is to determine what type of dispute is at issue. The relevant facts are largely uncontroverted. By August of 2004, the FAA had granted Boston-Maine authority to operate up to three large aircraft. Pursuant to that authorization, Boston-Maine had begun operating one Boeing 727 and Pan Am had begun contracting with Boston-Maine to undertake some scheduled Pan Am flights. The threshold question is whether the controversy that erupted over

13

these events constitutes a major or minor dispute as those terms are used in the lexicon of the RLA.

The defendants maintain that the dispute is minor because their position is arguably justified by the terms of the CBA. In this regard, they emphasize the CBA's "scope" clause, CBA § 1.B, which restricts the conduct of "all flying by and for the service of the Company on aircraft owned or leased by and for the Company and utilizing the authority granted under the Company's operating certificate" to "pilots whose names appear on the Pilots' System Seniority List."[4] Noting that the scope clause further provides that, with exceptions not pertinent here, "the Company retains all authority and rights to manage its operations," the defendants argue that both the conduct of parallel flight operations by Pan Am's corporate sibling and the subsequent contracting out are allowable.

The defendants find additional support for their position in the bargaining that predated the CBA. They point out that, during the negotiations, ALPA unsuccessfully proposed broad language for the scope clause — language that, at least arguably, would have prevented Pan Am's corporate affiliates from developing parallel businesses. Because courts look to the parties' bargaining history for help in determining whether a given dispute is major or minor, see Transp.-Comm. Employees Union v. Union Pac.

_____

[4]"Company" is defined elsewhere in the CBA as meaning Pan Am.

14

R.R. Co., 385 U.S. 157, 160-61 (1966); Bhd. of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co., 138 F.3d 635, 640-41 (7th Cir. 1997), the defendants view this track record as strengthening their hand.

In addition to arguing that ALPA bargained away any restriction on the defendants' right to engage in parallel service through affiliated airlines, the defendants also assert that the CBA explicitly authorizes Pan Am to contract with others to fly scheduled Pan Am flights. This assertion rests primarily on section 1.B.2 of the CBA, which provides that Pan Am "may enter into aircraft interchange agreements with other carriers if such interchange agreements do not result in the furlough of any of the Company's pilots." The defendants claim that ALPA was aware of Pan Am's interest in contracting with Boston-Maine prior to the execution of the CBA; that this history informs the text of section 1.B.2 and makes meaningful the absence of any express prohibition on contracting with corporate affiliates; and that, since the contracting out did not result in furloughing any Pan Am pilots (although the pilots were, of course, scheduled for fewer hours), it was fully in accord with section 1.B.2.

Finally, the defendants conjoin the scope clause and section 1.B.2 and asseverate that the combination amply satisfies the company's modest burden of demonstrating that its interpretation of the CBA is arguably justified. See Conrail, 491

15

U.S. at 307 (holding that the company's burden to establish exclusive arbitral jurisdiction is "relatively light").

For its part, ALPA derides this focus on the language and history of the CBA. It contends that, regardless of those features, the RLA itself prohibits Boston-Maine from either expanding into large aircraft service or entering into contracts to operate any Pan Am flights. As a fallback, ALPA raises the decibel level and declaims that the CBA, notwithstanding its language and history, cannot in good conscience be interpreted to "authorize the massive unilateral transfer of work to [a] non-union alter-ego, resulting in the abrogation of all RLA rights of the Pan Am pilots." Appellee's Br. at 10. We use ALPA's contentions to frame the issue.

ALPA's statutory argument relies principally on our decision in Springfield Terminal. ALPA reads that case to stand for the proposition that — irrespective of either the language in or the history behind a CBA — an employer subject to the RLA may never use a commonly owned non-union affiliate to perform work of the type traditionally performed by union members. See Springfield Terminal, 210 F.3d at 33 ("[E]ven the loss of completely new business, never performed by the unions, may be considered a change in the working conditions if the unions traditionally performed work of this type." (citation and internal quotation marks omitted)). Clinging to this thesis, ALPA accuses the defendants of

16

contravening the RLA simply by expanding Boston-Maine's operations to include 727 service (and, thus, performing work traditionally done by Pan Am's unionized pilots).

We agree that an employer sometimes may create a major dispute by transferring work the union already has been doing. See, e.g., id. at 31-32. So too an employer sometimes may create a major dispute by shifting new work to a corporate affiliate. Id. at 33 (dictum). But "sometimes" is the operative word. The essence of any dispute under the RLA derives from the particular relationship of the parties, see Shore Line, 396 U.S. at 152-54; Union Pac., 157 U.S. at 161, and Springfield Terminal did not lay down a blanket rule applicable in every case or in all circumstances. Context is of paramount importance: the transfer of existing work or of new work opportunities gives rise to a major dispute only if the union can be said to have had an exclusive right to the work. See United Transp. Union v. Gateway W. Ry. Co., 78 F.3d 1208, 1215-16 (7th Cir. 1996). ALPA makes no such claim. The most that its brief suggests — and that reading is a stretch — is that because Boston-Maine previously had limited itself to flying smaller aircraft, ALPA reasonably expected that all large aircraft would be operated by Pan Am.

At this stage of the proceedings, that expectation cannot carry the day. Even if ALPA's construct is objectively reasonable (a matter on which we take no view), it is not so irresistible that

17

it overwhelms the defendants' contrary and otherwise plausible interpretation of the existing CBA. After all, if a dispute involves two reasonable but competing interpretations of the parties' rights under a CBA, the dispute is not major. See Me. Cent. R.R. Co. v. United Transp. Union, 787 F.2d 780, 782 (1st Cir. 1986). In that event, both parties' positions are arguably justified, so the dispute is minor. Conrail, 491 U.S. at 307.

ALPA also places Springfield Terminal at the head of a line of RLA cases that found major disputes to exist when an employer transferred work from a unionized company to a commonly owned non-union affiliate. See, e.g., Springfield Terminal, 210 F.3d at 33; Burlington N., 862 F.2d at 1275-76; Butte, Anaconda & Pac. Ry. Co. v. Bhd. of Locomotive Firemen, 268 F.2d 54, 59-60 (9th Cir. 1959). Once again, context is critically important. While each of those cases involved the transfer of union work to a nonunionized subsidiary, none of them involved an allegation that an existing CBA explicitly authorized the transfer. The RLA does not categorically pretermit all transfers of union work to non-union affiliates, and we believe that the parties to a CBA are free to contract around any prohibition against the transfer of union work to non-union affiliates. The defendants have made a colorable argument that the parties in this case did just that.[5]

---

[5]ALPA also contends that the defendants' interpretation of the CBA is unreasonable (and, thus, not arguably justified) because it would allow Pan Am to abrogate the pilots' entire panoply of RLA-

18

To sum up, the defendants plausibly assert that the parties authorized an arrangement, memorialized in the CBA, to allow Pan Am's corporate affiliates to operate large aircraft alongside Pan Am and, subject to certain carefully circumscribed conditions, to contract with other airlines (including Boston-Maine) to operate some of Pan Am's scheduled flights. Because such an interpretation of the CBA is neither obviously insubstantial nor barred by the RLA, the "contracting out" dispute between ALPA and the defendants is minor. It follows inexorably that arbitration affords ALPA's sole avenue for relief with respect to this practice. See, e.g., Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists, 915 F.2d 43, 49 (1st Cir. 1990). Consequently, the district court erred in predicating injunctive relief on this ground.[6]

## C. **Diversion of Business**.

The second challenged practice concerns the defendants' decision to close down Pan Am while continuing 727 service through

protected rights. But ALPA glosses over two points. First, the CBA explicitly limits Pan Am's right to outsource work by providing that such contracting is impermissible if it brings about the furloughing of one or more union pilots. Thus, the feared across-the-board usurpation of RLA-protected rights is wholly speculative. Second, as to contracting out, ALPA has shown only that Boston-Maine operated a few Pan Am flights during the time frame preceding the issuance of the preliminary injunction.

[6]Of course, we cannot — and do not — decide whether the CBA actually permitted the defendants to engage in the challenged conduct. As in any minor dispute under the RLA, that judgment is for the arbitrator.

19

the instrumentality of Boston-Maine. Building on the commonality of ownership that links Pan Am and Boston-Maine, ALPA alleges that the common owners engaged in a scheme to release themselves entirely from their collectively bargained obligations while still retaining Pan Am's core business under the Boston-Maine label. ALPA insists that, at a minimum, this conduct presents a major dispute and that, alternatively, it violates the "organizational rights" protections of the RLA, 45 U.S.C. § 152, Third and Fourth (independent of any question of contractual breach).

We first consider whether a major dispute exists. Had Pan Am remained in business but engaged in a wholesale transfer of the work of its unionized pilots to Boston-Maine, that audacity might well have fomented a major dispute. Although we found plausible the defendants' argument that the CBA allowed Pan Am to contract out <u>some</u> flights, <u>see</u> <u>supra</u> Part IV(B), we doubt that the CBA reasonably can be interpreted to give Pan Am carte blanche to contract out <u>all</u> flights.

Here, however, Pan Am has gone out of business. That fact is crucial to the proper analysis of the issues before us. The Supreme Court has held squarely that decisions to go out of business are "so peculiarly matters of management prerogative that they [will] never constitute violations" of the RLA. <u>Pittsburgh & Lake Erie R.R. Co.</u> v. <u>Ry. Labor Execs.' Ass'n</u>, 491 U.S. 490, 507

20

(1989) (quoting <u>Textile Workers</u>, 380 U.S. at 269).[7]  Although such decisions profoundly affect workers, companies cannot be forced to stumble along on life support contrary to the interests of their shareholders.  Thus, the continued existence of a company is simply not among the constellation of issues on which an employer is obliged to bargain.[8]  <u>Id.</u> at 509.

In the instant case, there is a twist:  although Pan Am had announced its intention to go out of business prior to the commencement of this suit (and has since done so), the defendants' interlocked management decided that Boston-Maine should continue to fly.  Management apparently intends that Boston-Maine will take over at least some of Pan Am's former business (the extent is unclear, partially because the lower court's injunction precluded any such activity).  Thus, the question reduces to whether a non-

---

[7]Our dissenting brother suggests that the defendants have forfeited any argument based on <u>Pittsburgh & Lake Erie</u> by not citing that case to the district court or in their opening brief on appeal.  He confuses the making of an argument with the citation of a case.  Although the defendants did not cite <u>Pittsburgh & Lake Erie</u> until their reply brief, they have — from the beginning of this case — made the argument that because Pan Am went out of business entirely, no transfer of work took place.  Therefore, there is no procedural barrier to our consideration of this argument.

[8]That an employer has no obligation to bargain over the decision to go out of business does not mean that it has no obligation to bargain over the effects of that decision.  To the contrary, the RLA requires employers to bargain over those effects if the union seasonably requests such bargaining.  <u>Pittsburgh & Lake Erie</u>, 491 U.S. at 512.  The union may not, however, leverage that obligation into a means of delaying or otherwise impeding management's decision to shutter the shop.  <u>Id.</u>

union corporate affiliate may, when a unionized carrier closes its doors, assume portions of the latter's business portfolio without either triggering a major dispute or violating the RLA.

ALPA seeks to avoid a direct answer to this question, insisting that the rule of Pittsburgh & Lake Erie is inapplicable to this case because the defendants shut down only part of their aggregate business (i.e., they permanently grounded Pan Am but kept Boston-Maine aloft).  The union's position is incorrect.  In Textile Workers, an NLRA case heavily relied upon by the Pittsburgh & Lake Erie Court, the defendant ran a number of manufacturing operations as separate subsidiaries.  After workers at one plant voted to unionize, management liquidated that subsidiary while allowing other subsidiaries in the same line of business to remain active.  Textile Workers, 380 U.S. at 265-67.  Although the Court left open the possibility that closing the unionized plant might be considered an unfair labor practice if it were done for the primary purpose of intimidating employees at other commonly owned facilities, id. at 275-76, it never suggested that the right to cease operations without first bargaining with the union depended on management's willingness to halt similar operations in other parts of the corporate empire.  Similarly, the dissent's effort to distinguish Pittsburgh & Lake Erie on the ground that the sale of assets in that case was between unrelated corporations is

22

unavailing. Although the companies there were unrelated, the Court never suggested that anything turned on that fact.

The case law reflects the ubiquity of the Pittsburgh & Lake Erie doctrine and its applicability under the RLA. Numerous cases hold that a railroad owning multiple lines may sell some and keep others in operation without triggering bargaining obligations under the RLA. See, e.g., Ry. Labor Execs.' Ass'n v. CSX Transp., Inc., 938 F.2d 224, 229 (D.C. Cir. 1991); Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n, 908 F.2d 144, 152, 155 (7th Cir. 1990). Thus, we find the teachings of Pittsburgh & Lake Erie fully applicable to this case.

Pittsburgh & Lake Erie does not, however, address what — if any — restrictions devolve upon surviving corporate affiliates after a unionized carrier shuts its doors. We conclude that, as long as the unionized company actually terminates operations and would have done so regardless of the availability of a non-union affiliate as a vehicle for picking up the pieces of its abandoned business, the RLA itself creates no restrictions either on the company that is going out of business or on the affiliate that is seeking to salvage the defunct company's operations.

Our starting point remains the Supreme Court's holding that a company may cease its operations for any reason or no reason without triggering an obligation to bargain. That is, the continued existence of the company — and by extension the union

23

members' jobs — simply is not guaranteed by the RLA. Pittsburgh & Lake Erie, 491 U.S. at 509. And since closing is management's prerogative, it would make little sense to condition the exercise of that prerogative on management's commitment to refrain from engaging in similar businesses in the future. For example, if Pan Am closed and its owners subsequently decided to start a new airline from scratch, we do not see how the RLA would preclude them from the attempt. Conceptually, it should not ordinarily make a difference that management is continuing to pursue similar operations through existing, rather than new, businesses.

On balance, this rule serves the interests of all concerned. If an airline is going under, it benefits no one to prevent an affiliated corporation from assuming all or part of its business. Rather than insisting that the baby be thrown out with the bath water, it makes sense to allow affiliates to continue those aspects of the closed corporation's business that they deem viable, thereby maintaining some jobs, continuing services beneficial to the public, and recouping some profit for the owners.

It might be feared that such a rule will create an incentive for management to cut and run rather than trying to make a go of a struggling business, and that, if this occurs, it will lead to the loss of union jobs. For that argument to prevail, however, it would be necessary for union members to have some right under the RLA to insist that management try to make a go of a

24

unionized business. But as we have pointed out, union members have no such right. See Pittsburgh & Lake Erie, 491 U.S. at 509 ("Absent statutory direction to the contrary, the decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment . . . ."). Because employees have no right to force a company to remain in business, they lose nothing when, after the company fails, an affiliated company absorbs some (or perhaps all) of the closed company's business operations.

Assuming that the CBA neither authorizes nor forbids the transfer, an exception to this general rule might arise when the company going out of business does so for the explicit purpose of transferring its unionized operations to an affiliated corporation without any union ties. Although there exists little law on the issue and the Supreme Court has shown itself fairly hostile to applying the RLA to run-of-the-mill business closures, we hold that a union might have an arguable claim worthy of mediation if a company that closes its doors would not have done so but for the opportunity to transfer its unionized operations to a non-union affiliate. Similarly, if a carrier is to avail itself of the rule of Pittsburgh & Lake Erie, it may not engage in a shell game — a series of paper transactions that have the effect of winding up the business as a technical matter while management then resumes the same business in a different corporate guise. For example, we

25

think it obvious that the owner of a unionized airline could not form a new corporation, sell all the assets of the airline to the new corporation, and continue to operate the airline unfettered by the CBA. Cf. Southport Petroleum Co. v. NLRB, 315 U.S. 100, 105-06 (1942) (holding, in an NLRA case, that a company may not avoid its obligations under a CBA by a paper liquidation and sale of assets when the transaction is a sham and the owners retained control of the business); J. Vallery Elec., Inc. v. NLRB, 337 F.3d 446, 450-51 (5th Cir. 2003) (similar). Indeed, such facts could well give rise not only to a major dispute but also to a minor one.

Still, when an employer shuts down entirely but continues similar business operations through a corporate affiliate, judicial inquiry is quite limited. That inquiry is properly focused not on whether the employer can in some sense be said to have transferred union work to the surviving affiliate, but, rather, on whether the employer itself went out of business so that its union work could be transferred to its ununionized affiliate. If there is no subterfuge, the closure is in fact legitimate and complete, and the answer to this question is in the negative, then the decision to close falls outside the ambit of bargainable disputes under the RLA.[9]

---

[9]We caution that in determining whether the unionized employer's business justification is a sham and that it shut down solely for the purpose of avoiding the CBA, evidence of generalized union animus, though perhaps relevant, is insufficient to establish an unlawful scheme. The union must show that the specific decision

In this case, nothing in the record points to such an artifice. The undisputed evidence is that Pan Am was losing money hand over fist; that the company surrendered its operating certificate to the FAA; that it is no longer serving customers; and that it took many of these actions <u>after</u> the district court had enjoined Boston-Maine from taking on Pan Am's routes. That Boston-Maine still seeks to carry passengers over routes previously flown by Pan Am does not change these facts. Accordingly, a finding of a major dispute is not sustainable on the record as it now stands. Though it seems a long shot, we think that the union should be entitled to attempt to demonstrate, on remand, that Pan Am was shut down only because it was possible to transfer its union-flown routes to a non-union affiliate — and, if so, that a major dispute was thereby created.

The dissent insists that the foregoing analysis is beside the point because the CBA contains a provision expressly limiting the defendants' rights in the event Pan Am closed. We disagree that the CBA contains any such provision. The dissent relies on the CBA section that authorized Pan Am, while it was in business, to contract with other carriers to operate certain flights, as long as that contracting did not result in the furlough of any union pilots. Nothing in that section purports to limit the rights of

to close was taken for the purpose of repudiating the CBA and avoiding its strictures.

affiliated companies to engage in large aircraft service should Pan Am cease operations. Moreover, the CBA nowhere addresses the company's or the union's right in the event of a business closure. Given these facts the dissent's attempt to read into the CBA an explicit limitation on Pan Am's right to cease operations is plainly implausible. At the expense of carting coal to Newcastle, we add that even if an argument could be made for the dissent's interpretation, that argument would be far from conclusive and thus would, at best, create a minor dispute under the RLA (in which case no injunction would be appropriate). Conrail, 491 U.S. at 304.

Having established that ALPA has not met its burden of showing the existence of a major dispute under the FLA, we turn briefly to the union's argument that the defendants' actions independently violated the pilots' organizational rights. Generally speaking, 45 U.S.C. § 152, Third and Fourth prohibit carriers from taking actions designed to interfere with employees' rights to organize and bargain collectively. The Supreme Court emphasized this point in TWA, in which it held that once a union is certified, employees' rights under section 152, Third and Fourth are narrowly circumscribed. 489 U.S. at 440-41. The reason for this limitation is that once a union has been certified, represented employees may avail themselves of the other dispute resolution processes created by the RLA. Id. Moreover, because judicial battles under section 152 are appropriately waged only in

28

rare circumstances, courts must be careful to restrict their role lest they encroach on the alternative dispute resolution processes that lie at the heart of the RLA.  See id.; Wightman, 100 F.3d at 234.

Although employees' postcertification rights under section 152 are quite limited, they are not nonexistent.  In Wightman, we held that, after a union has been certified, an employer may violate section 152 in the rare circumstance when the employer's actions constitute "a fundamental attack on the collective bargaining process or . . . a direct attempt to destroy a union."  100 F.3d at 234.  In an effort to squeeze through this jurisdictional aperture, ALPA argues that the defendants' scheme to continue Pan Am's operations through the medium of Boston-Maine constitutes a direct attempt to destroy the union.  By this, we take ALPA to mean that the defendants have wholly repudiated the CBA and, thus, effectively "destroyed" the union.

ALPA misunderstands the reach of section 152.  For a company's conduct to be actionable under that provision, it must somehow interfere with the employees' rights to organize or bargain.  TWA, 489 U.S. at 440-41.  Thus, the Court in TWA, considered whether the airline's practice of retaining workers who had stayed on the job during a strike rather than replacing them with more senior persons who had participated in the strike violated the union's right under the RLA to engage in self-help.

29

Id. at 430-31. Although it ultimately ruled in favor of the airline, the Court found this challenge to be justiciable because it potentially affected the unionized employees' rights to engage in collective self-help. See id. at 440-41. So too the court in Dempsey v. Atchison, Topeka & Santa Fe Railway Co., 16 F.3d 832 (7th Cir. 1994), found that a union stated a claim under section 152, Third and Fourth, by alleging that a side letter to a CBA interfered with employees' rights to organize by coercing them to join one union rather than another. Id. at 840-41.

Such situations are to be contrasted with those involving violations of a CBA or even the repudiation thereof; those situations ordinarily will not come within the ambit of section 152, Third and Fourth. See Boston & Me. Corp., 808 F.2d at 159-60 (suggesting that when resolution of a dispute requires interpretation of a CBA, the dispute cannot be adjudicated as a violation of statutory rights, but must be resolved through the RLA's other dispute resolution mechanisms). Were the rule otherwise, almost any breach of a CBA could be recast as an affront to the employees' rights to bargain collectively. That result plainly would be at odds with the RLA. See TWA, 489 U.S. at 441.

Stripped of rhetorical flourishes, the union's only substantial allegation in this case is that the defendants violated the CBA by transferring (or plotting to transfer) covered work to an affiliated corporation. There is nothing to suggest that the

30

defendants have somehow tried to prevent the pilots from organizing or that they have erected obstacles to the pilots' ability to act collectively.[10] Nor is there any evidence of discrimination against unionized employees such as might suggest an effort to intimidate others into boycotting the union. Accordingly, ALPA has failed to state an actionable claim under section 152, Third and Fourth. See Bhd. of Locomotive Eng'rs v. Kansas City So. Ry. Co., 26 F.3d 787, 795-96 (8th Cir. 1994) (rejecting a claim under § 152, Third and Fourth when the challenged action did not "overtly or inherently discourage union activities or discriminate against those who encourage such activities").

ALPA's reliance on the decision in Ruby v. Taca Int'l Airlines, 439 F.2d 1359 (5th Cir. 1971), is mislaid. In that case, an airline attempted to transfer unionized pilots from New Orleans to El Salvador. The CBA would have been unenforceable in El Salvador, so the transfer would have resulted in a total abnegation of the pilots' collectively bargained rights. Id. at 1361. In addition to finding a major dispute, the Fifth Circuit concluded that section 152, Fourth prohibited the transfer. Id. at 1363-64.

The Ruby decision long predates the Supreme Court's decision in TWA, and that chronology casts doubt upon its continued

_____

[10]To be sure, the record contains some testimony to the effect that Pan Am had engaged in such activities in the past. But those past actions are not the subject of ALPA's present challenge and have no bearing on whether the conduct at issue here constitutes a violation of the pilots' organizational rights.

31

vitality.  In any event, there is a crucial distinction between Ruby and this case.  In Ruby, the airline's plan not only would have rendered the CBA unenforceable but also would have prevented the pilots from engaging in future collective action.  Here, however, the defendants' rearrangements would have no effect on the pilots' ability to engage in collective action on a going-forward basis.

ALPA nonetheless maintains that a dispute exists under section 152, Third and Fourth because the union has no other adequate remedy.  Specifically, ALPA suggests a judicial forum is necessary because "[o]nly the courts, rather than arbitrators or administrative agencies, have jurisdiction and authority to protect employees' 'statutory' RLA organizational rights."  Appellee's Br. at 48.  This argument is question begging at its worst.  While it may be true that only courts have authority to adjudicate disputes under section 152, Third and Fourth, see, e.g., Boston & Me. Corp., 808 F.2d at 157, there must be a substantial dispute under those provisions before a court may intervene.  See Renneisen v. Am. Airlines, Inc., 990 F.2d 918, 922-23 (7th Cir. 1993).  ALPA has failed to demonstrate the existence of such a dispute.

At any rate, the union's other remedies under the RLA are fully adequate.  If it is ultimately determined that a major dispute exists, the union will be entitled to an injunction requiring the defendants to maintain the status quo while the

32

parties undertake the extra-judicial processes limned in the RLA. Conrail, 491 U.S. at 303.  If mediation occurs and is unsuccessful, the union will have a right to engage in self-help.  Id.[11]  And conversely, if no major dispute exists, then (at least in this case) the union will have no contractual rights to vindicate.  See Pittsburgh & Lake Erie, 491 U.S. at 509.  This is the dispute resolution process fashioned by Congress and embodied in the RLA. Courts do not have a roving writ to supplant it under the guise of adjudicating "statutory rights."  Accordingly, section 152, Third and Fourth, cannot provide a foundation for the district court's injunction.

The upshot is that the district court erred by misconceiving the proper inquiry and thus erred in its determination that ALPA was likely to succeed on the merits of its claims.  Because likelihood of success is a sine qua non to preliminary injunctive relief, Bl(a)ck Tea, 378 F.3d at 15, this error requires that we vacate the district court's decree.  We do so, however, without prejudice to further proceedings in that court.  Although it seems doubtful that the union can succeed on the record as it now stands, further developments have occurred

---

[11]We hasten to add that, under the RLA, a union may bargain for terms that provide workers with a special prophylaxis in the event that the employer goes out of business.  The CBA in this case contains no such terms.  Additionally, a union may assert a right to represent the employees who undertake transferred work and bring any ensuing representational dispute before the National Mediation Board.  For whatever reason, ALPA thus far has eschewed that path.

(e.g., Pan Am's actual closing) and we think it just that the union be given an opportunity, should it so choose, to adduce additional evidence and attempt to make out a winning case.

### D. **The Bond Requirement**.

There remains a loose end. Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, applies in connection with injunctions issued under the RLA. See E. Airlines, 925 F.2d at 9. Under that statute, a party obtaining an injunction must post an undertaking "sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order." 29 U.S.C. § 107.

Here, the nisi prius court, as part of its order for preliminary injunctive relief, rejected the defendants' more extravagant damage submissions and required ALPA to post only a $50,000 bond. The defendants protest that the bond amount is too low and invite us to increase the amount retroactively. We decline the invitation.

We need not pass upon the adequacy of the bond amount. Even if a $50,000 bond was plainly inadequate to compensate the defendants for their anticipated damages and attorneys' fees — a matter on which we take no view — we lack authority to modify the district court's decision on the amount of the bond retroactively.

34

Once a court determines the appropriate amount of an injunction bond, the plaintiff is free to decide that it is better to forgo the injunction than to post the bond and risk losing the penal sum if the injunction is later deemed to have been improvidently issued. Retroactively increasing the amount of a bond would deprive the plaintiff of its right to make that decision on an informed basis. Thus, it would be grossly unfair for us to increase the penal sum retroactively.[12]

## V. CONCLUSION

We need go no further. More than anything else, this case illustrates that judicial remedies under the RLA are only available in special circumstances. Whatever we may think of the defendants' actions, our jurisdiction is severely limited, and the parties must live with the bargain that they struck in the CBA. On remand, ALPA will have an opportunity to demonstrate, consistent with this opinion, that the defendants have tried to evade those obligations in an impermissible manner. Failing that, the union must take its grievances elsewhere.

**Vacated and remanded for further proceedings consistent with this opinion.  Costs to appellants**.

**— Dissenting Opinion Follows —**

---

[12]Nor is there any need, at this stage of the proceedings, to dwell on the bond on a going-forward basis. The vacation of the injunction eliminates the need for continuing the bond in effect.

**CYR, <u>Senior Circuit Judge</u> (dissenting).** Although the majority opinion cogently presents its rationale for classifying the ALPA claim as a "minor" dispute under the RLA, its rationale is premised upon an interpretation of <u>Pittsburgh & Lake Erie Railroad Co.</u> v. <u>Railway Labor Executives' Association</u>, 491 U.S. 490 (1989) ("<u>P & LE</u>"), which is both overbroad and fundamentally flawed. Consequently, I respectfully dissent.

The appellants neither cited nor relied upon the <u>P & LE</u> decision in the district court, nor have they done so on appeal. Accordingly, their argument has been twice forfeited, and should not be addressed <u>sua</u> <u>sponte</u>. <u>See</u> <u>Plumley</u> v. <u>S. Container, Inc.</u>, 303 F.3d 364, 372 n.7 (1st Cir. 2002).[13] Further, it seems highly

---

[13]The majority asseverates that the defendants adequately preserved the legal theory propounded in <u>P & LE</u> merely by arguing – in general terms – that, "because Pan Am went out of business entirely, no transfer of work took place." Besides the implausibility of the notion that defendants could advance a legal principle without citing the seminal Supreme Court case establishing it, we repeatedly have refused to countenance the majority's generalized approach to issue preservation. <u>See</u> <u>B&T Masonry Constr. Co.</u> v. <u>Pub. Serv. Mutual Ins. Co.</u>, 382 F.3d 36, 41 (1st Cir. 2004) ("'[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court.'") (citation omitted); <u>Am. Cyanamid Co.</u> v. <u>Capuano</u>, 381 F.3d 6, 18 (1st Cir. 2004) ("'We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation'") (citation omitted). Nowhere in their appellate brief did the defendants even remotely allude to the <u>P & LE</u> legal theory – that regardless whether their proposed interpretation of particular CBA terms can be considered "arguably justified," thus engendering only a "minor dispute" – the RLA independently and implicitly afforded them an absolute prerogative to close Pan Am for any reason and with complete immunity from a status-quo injunction, an entirely distinct legal theory, which, if meritorious, moots defendants'

36

probable that appellants refrained from citing P & LE due to the fact that they considered it – as do I – inapposite to the facts in this case, in at least two important respects.

First, unlike Pan Am, P & LE proposed to sell all its operating assets to a company with which it had no apparent corporate affiliation. See P & LE, 491 U.S. at 494-95 (noting that "P & LE agreed to sell its assets . . . to a newly-formed subsidiary, P & LE Rail Co., Inc. (Railco), of Chicago West Pullman Transportation Corporation (CWP)"). P & LE and Railco were entirely distinct entities, with no measure of common ownership or control. In such an arm's-length transaction, P & LE had nothing to gain from Railco's decision not to assume the CBA, and accordingly would have had no motive, incentive, nor even the means to utilize the closure to circumvent its obligations to unionized employees as required by the CBA. Nor was it possible that the closure constituted a manipulative effort to structure the transaction among P & LE's affiliated companies for the sole purpose of divesting itself of the union.

In contrast, the district court determined that Pan Am and Boston-Maine were "part of the same corporate family," and the findings of fact upon which it premised its conclusion plainly are not clearly erroneous. Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., No. 04-331-JD, 2004 WL 2203570, at 6 (D.N.H. 2004).

interpretive gloss on the CBA.

37

To by-pass the corporate veil-piercing inquiry, see supra Majority Opinion, at Section IV.A., and then to construe P & LE as having adopted a rule to the effect that any employer's prerogative to close its doors is per se immune from an RLA status-quo injunction, would exalt form over substance by presumptively and artificially treating a single employer's (viz., Guilford's) potentially unified closure/diversion transaction as two distinct transactions, which in turn would encourage employer manipulation of their intra-"corporate" entities in a manner antithetical to the RLA's policies. In my view, P & LE is materially distinguishable because the Court was presented with no evidence that the selling company's corporate veil should be pierced, but rather with an arm's-length transaction from which the selling company had no means of reaping or sharing in the buying company's post-sale benefit of the bargain. Significantly, the majority opinion cites no decision, during the sixteen-year period since P & LE was decided, which has extended its holding to preempt an equitable veil-piercing analysis.

Second, P & LE is inapposite because it did not involve any CBA provision which would create rights in P & LE's employees in the event P & LE were to decide to cease all operations. See P & LE, 491 U.S. at 503 (noting that none of the CBAs at issue "dealt with the possibility of the sale of the company, sought to confer any rights on P & LE's employees in the event of the sale, or

38

guaranteed that jobs would continue to be available indefinitely") (emphasis added); <u>Chi. & N. W. Transp. Co.</u> v. <u>Ry. Labor Executives' Ass'n</u>, 908 F.2d 144, 153 (7th Cir. 1990) (noting that <u>P & LE</u> rule applies "because the sale does not violate the status quo <u>as defined</u> by the collective bargaining agreement").

In holding that P & LE's employees could not enjoin the sale pending bargaining over the effects of the sale, the Supreme Court observed that the right to indefinite employment was not a "condition of employment" over which P & LE was obligated to bargain, and that it had unfettered discretion to terminate its entire business "'for any reason [it] pleases.'" <u>P & LE</u>, 491 U.S. at 507 (citation omitted). This maxim applies even though the CBA contains no provision which expressly authorizes a unilateral closure decision, since the employer has certain managerial prerogatives which are implied. <u>Id.</u> at 509; <u>see</u> <u>Ry. Labor Executives Ass'n</u> v. <u>City of Galveston, Tx.</u>, 897 F.2d 164, 169 (5th Cir. 1990) (interpreting <u>P & LE</u>).

The Court did not suggest, however, that the same rule should apply when the CBA at issue contains an express anti-diversion provision which confers upon employees the contractual right to prevent a closure. Here, the CBA negotiated by ALPA contains just such an unambiguous provision, according Pan Am's pilots the right to bargain over any closure which permits Pan Am to divert business to another company, but only as long as such

39

diversions "do not result in the furlough of any of the Company's pilots." In context, the term "furlough" (viz., a mutually agreed upon leave of absence) must be construed as the equivalent of "lay-off." The Pan Am pre-closure diversions of some 727 flights to Boston-Maine neither implicated nor violated this CBA provision, due to the fact – as the majority decision notes – that they resulted in no lay-off of Pan Am pilots, but simply a diminution in the pilots' flight hours.

On the other hand, the permanent closure of Pan Am does unmistakably implicate the pilots' express rights, in that it has resulted in the lay-off of all of the unionized Pan Am pilots. Accordingly, the district court sensibly held that any other proposed interpretation of the CBA provisions is not "arguably justified." See Air Line Pilots Ass'n, 2004 WL 2203570, at 7 ("[T]he Court finds it totally implausible that ALPA would agree to a provision in the CBA stating that Pan Am could 'create or acquire an alter ego [completely] to avoid the terms and conditions of the Agreement.' . . . [and] such a provision . . . would be contrary to law."). Unlike P & LE's employees, Pan Am's pilots do not rely upon the CBA's "silence," but upon a clause expressly purporting to limit Pan Am's implied prerogatives to close "for any reason."[14]

---

[14]Perhaps in acknowledgment of the harsh interpretation it accorded P & LE, the majority opinion admirably attempts to engraft upon the P & LE holding a limitation that an employer can exercise its prerogative for only a legitimate business reason. See supra Majority Opinion, at Section IV.C. Unfortunately, this dictum

40

Pan Am possesses implicit managerial prerogatives, but nothing in either the RLA or P & LE suggests that it cannot waive those prerogatives in CBA negotiations. See Chi. & N.W. Transp., 908 F.2d at 152 ("A matter of prerogative is one the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the [RLA] forbids it to do so. If there has been no waiver of prerogative in the [CBA], then the union cannot insist that the carrier bargain over prerogative matters."). Since the closure/diversion would require rescission or reformation of an extant CBA clause, rather than its mere interpretation, by definition it is a "major" dispute under the RLA. See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 23 & n.3 (1st Cir. 2000).

For at least these two important reasons, the defendants in this case prudently decided not to rely upon the inapposite P & LE decision, either in the district court or on appeal. In all events, the argument has been waived. As ALPA is entitled to bargain (viz., negotiate and self-help) over both the Pan Am closure and its effects, I would affirm the status-quo injunction granted by the district court.

---

cannot be found anywhere in P & LE's language. Moreover, it is belied by the Court's unqualified declaration that the closure may be for "any reason [the employer] pleases," even when the employer is motivated by anti-union animus. P & LE, 491 U.S. at 507.